SHILPI AGARWAL (SBN 270749)
sagarwal@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

JULIA A. GOMEZ (SBN 316270)
jgomez@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
(213) 977-5232

*Additional counsel on next page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

OCA-ASIAN PACIFIC AMERICAN ADVOCATES; OCA-SAN MATEO; OCA-SACRAMENTO; and COMMON CAUSE

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security;
UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES;
JOSEPH B. EDLOW, in his official capacity as Director of United States Citizenship and Immigration Services;

Defendants.

Case No.: ____________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

MING CHEUNG*
mcheung@aclu.org
THERESA J. LEE*
tlee@aclu.org
GARRETT MUSCATEL*
garrettmuscatel@aclu.org
JUAN M. RUIZ TORO*
jruiztoro@aclu.org
DAVIN M. ROSBOROUGH*
drosborough@aclu.org
SOPHIA LIN LAKIN*
slakin@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

LUCAS A. RODRIGUEZ*
lrodriguez@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
(202) 457-0800

NIYATI SHAH*
nshah@advancingjustice-aajc.org
NOAH BARON (SBN 321960)
nbaron@advancingjustice-aajc.org
SHALAKA PHADNIS (SBN 335896)
sphadnis@advancingjustice-aajc.org
ASIAN AMERICANS ADVANCING JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036
(202) 296-2300

SEAN F. BIGLEY (SBN 300851)
Sfbigley@ajsocal.org
CATHERINE Y. HWANG (SBN 340136)
Chwang@ajsocal.org
BINWANT K. KAHLON (SBN 366721)
Bkahlon@ajsocal.org
ASIAN AMERICANS ADVANCING JUSTICE SOUTHERN CALIFORNIA
1145 Wilshire Blvd.
Los Angeles, CA 90017
(213) 241-0286

*application for admission *pro hac vice* forthcoming

*Counsel for Plaintiffs*

Plaintiffs, OCA-Asian Pacific American Advocates, OCA-San Mateo, OCA-Sacramento, and Common Cause, by and through counsel, file this complaint for declaratory and injunctive relief against Defendants Department of Homeland Security, Secretary of the Department of Homeland Security Markwayne Mullin, United States Citizenship and Immigration Services, and Director of United States Citizenship and Immigration Services Joseph B. Edlow and allege as follows:

## INTRODUCTION

1. This lawsuit concerns the Unlawful Voter Initiative, a policy the United States Citizenship and Immigration Services (USCIS) adopted in August 2026. The Unlawful Voter Initiative systematically targets thousands of naturalized and derivative United States citizens for voter eligibility investigations and tracking by the federal government. USCIS has reassigned hundreds of agents to investigate individuals flagged by the Department of Homeland Security (DHS), USCIS's parent agency, as potential noncitizen voters. The precise origins of the list are still unknown, but every individual appearing on this list is associated with at least one Alien Number (A-Number). As part of the Initiative, agents are instructed to use those individuals' Personally Identifiable Information (PII) to search individuals' voter records on state voter registration websites—almost always without authorization—in order to investigate their purported voting history. If the agents suspect noncitizen voting, USCIS instructs them to create a TECS (not an acronym) record for the individual, documenting the suspected noncitizen voting.

2. As USCIS itself concedes, the Initiative relies on outdated or incorrect data.[1] The methods it uses are untested, unverifiable, and suspect—U.S. Senators have described it as relying on "highly questionable data and methods to identify purported unlawful voters,"[2] and even the

[1] *See* Appendix to Letter from Norman L. Eisen et al., Democracy Defs. Fund, to Hon. Alex Padilla, U.S. Senate Comm. On Rules and Admin. (Sept. 8, 2026), https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf [https://perma.cc/888X-C597] [hereinafter Whistleblower Disclosure].

[2] Letter from Sen. Alex Padilla et al. to Markwayne Mullin, Sec'y, U.S. Dep't. of Homeland Sec. (Sept. 13, 2026), https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf [https://perma.cc/888X-C597].

agency describes its process as "supplemental magic."[3] But it has real effects on the individuals wrongfully flagged. When a TECS record is created for an individual to flag a potential violation of law, that individual can be subjected to further investigative scrutiny and the corresponding stigma.

3. Defendants also use the information generated by the Unlawful Voter Initiative to interfere with state electoral processes. They have used the Unlawful Voter Initiative's output to demand that states (1) refuse to send ballots to voters identified by the Initiative as potential unlawful noncitizen voters; (2) segregate ballots received from those voters; and/or (3) to refuse to count ballots from those voters until the state confirms their citizenship. The federal government has already made this demand of California via litigation in which it seeks immediate relief requiring California to take these actions.[4] The federal government has also sent corresponding demands to elections officials in each of California's fifty-eight counties and issued threats of potential criminal exposure against those officials who do not comply.[5] Public reporting suggests California may not be the last state to receive those demands.[6] Indeed, most recently, the federal government presented Washington with a list of 405 individuals it believes to be noncitizen voters and demanded Washington take similar actions to those it demanded of California, or else risk similar litigation.[7]

4. The Unlawful Voter Initiative is the latest in the administration's efforts to focus the federal

[3] Whistleblower Disclosure at 19.

[4] Compl. at 14, *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 15, 2026), Dkt. No. 1.

[5] David Brunnstrom, *US Justice Dep't Demands California Counties Help Identify Suspected Noncitizen Voters*, REUTERS (Oct. 24, 2026), https://www.reuters.com/legal/government/trump-administration-demands-county-election-officials-identify-noncitizen-2026-10-24/ [https://perma.cc/5ZL8-75L5].

[6] Julia Ainsley, Ryan J. Reilly, Kelly O'Donnell & Jane C. Timm, *DOJ Weighs Election Litigation Against More States*, NBC NEWS (Oct. 21, 2026), https://www.nbcnews.com/politics/justice-department/doj-weighs-election-litigation-states-rcna604872 [https://perma.cc/LNN5-Z9ET].

[7] Letter from Charles Neil Floyd et al., Acting U.S. Att'y for the W.D. Wash., U.S. Dep't of Just., to Hon. Steve Hobbs, Sec'y of State, Wash. (Oct. 26, 2026), https://www.democracydocket.com/wp-content/uploads/2026/10/signed-letter-to-steve-hobbs-re-non-cit-ballots.pdf [https://perma.cc/HU6M-AXFL]; Gene Johnson & Rebecca Boone, *Trump Administration Asks Washington To Set Aside Ballots From 400 Voters It Says May Be Noncitizens*, AP NEWS (Oct. 26, 2026), https://apnews.com/article/washington-noncitizen-voting-63c17a3eadc9ed232fbd897afbd29b9d [https://perma.cc/ZGG3-8Z3S].

government's immigration-enforcement apparatus on alleged—and exceedingly rare—voter fraud. USCIS—an agency that "oversees lawful immigration to the United States"[8]—has no legitimate interest in purported voter fraud. But its actions (like those of DHS more generally) have real, lasting effects on American citizens. Through the Unlawful Voter Initiative, Defendants have created a rushed, flawed process that brands naturalized and derivative citizens as potential criminals in the federal government's eyes and then tries to disenfranchise them.[9]

5. Plaintiffs—whose members include naturalized citizens who are at increased risk of scrutiny over their voter eligibility—face ongoing harm from the Unlawful Voter Initiative in myriad ways. Plaintiffs' members swept into the Initiative by Defendants face non-uniform (and discriminatory) treatment in accessing their right to vote as compared to U.S.-born citizens by being subject to investigations into their eligibility to vote that U.S.-born citizens do not face and by subsequently being threatened with the possible denial of their right to vote, based on unreliable information and flawed processes. Plaintiffs' members are further harmed by Defendants' creating TECS records about them indicating supposed violations of law, which may subject them to further harassing scrutiny when they interact with government agencies.

6. Accordingly, Plaintiffs bring this action to put a stop to the Unlawful Voter Initiative and the violations of federal law on which it is based.

## PARTIES

7. Plaintiff OCA-Asian Pacific American Advocates (OCA) is a nonprofit, nonpartisan, grassroots membership-based organization with over thirty-five chapters and affiliates across the United States. It is headquartered in Washington, District of Columbia. Its mission is to advance the social, political, and economic well-being of Asian Americans, Native Hawaiians, and Pacific Islanders (AANHPIs), including through civic engagement.

---

[8] *What We Do*, U.S. Citizenship & Immigr. Servs. (USCIS) (Feb. 27, 2020), https://www.uscis.gov/about-us/mission-and-core-values/what-we-do [https://perma.cc/WQ82-UKWK].

[9] Letter from Norman L. Eisen et al., Democracy Defs. Fund, to Hon. Alex Padilla, U.S. Senate Comm. on Rules and Admin. at 3 (Sept. 8, 2026) https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf [https://perma.cc/888X-C597] [hereinafter Whistleblower Disclosure Cover Letter].

8. OCA was founded in 1973 as the Organization of Chinese Americans with the purpose—like many membership associations before it—of providing a unified voice for its community, namely, Chinese Americans in the civil rights movement. As the AANHPI population of the United States continued to grow and diversify following the elimination of most race-based restrictions on immigration, the Organization of Chinese Americans also changed to reflect that growing diversity. In 2013, it renamed itself "OCA-Asian Pacific American Advocates" to reflect its work on behalf of all AANHPIs.

9. OCA is a membership-based organization. It has approximately 200,000 members in 45 states, including California, and over 1,700 voting members, who pay dues. Voting members pay annual dues to OCA and choose to affiliate with a local chapter or be an "at large" member. Fifty percent of each member's dues are sent by OCA to the member's affiliated local chapter.

10. Current voting members have the right to vote for local chapter leadership, hold office within OCA and its chapters, and serve on committees or task forces.

11. An OCA chapter may designate a separate director to OCA's National Board or have the chapter president be its designee. The OCA National Board is comprised of leadership from the local chapters, with larger chapters having additional representation, and elects the Executive Council of OCA, including its president. OCA's National Board, *inter alia*, conducts, manages, and sets the mission, national policies and resolutions, and strategic plan and affairs of OCA. Each chapter must comply with policies, resolutions, and procedures set forth by the National Board.

12. OCA provides subgrants to its individual chapters, and the National Board includes each OCA chapter's board president.

13. Today, OCA chapters serve as their local communities' trusted voice and resource. They host cultural events; hold food and clothing drives; conduct community clean-ups; provide programming for AANHPI youth, professionals, and elders; conduct voter outreach and undertake other civic engagement work; and provide other resources to their communities, including naturalization and citizenship application support and voter registration.

14. Protecting their members' ability to safely and securely exercise their right to vote is central to OCA's mission, as well as its national and state priorities. OCA itself—and through its state and

local affiliates—regularly conducts nonpartisan voter registration, education, and mobilization efforts across the nation.

15. OCA also serves as a national resource hub by providing print and digital materials such as state-level voter guides and national support. OCA provides these resources to their members who are naturalized citizens in their preferred or native language.

16. OCA has members who include, but are not limited to, naturalized citizens, citizens who have derived their citizenship from their parents' naturalization (referred to herein as derivative citizens),[10] and U.S.-born citizens who have helped their foreign-born spouses naturalize.

17. Among these OCA members is Member A, a naturalized U.S. citizen who resides in Washington. Member A is a qualified, registered voter who votes regularly and intends to vote in upcoming elections. Member A did not register to vote or cast a ballot prior to Member A's naturalization.

18. Member A is harmed by Defendants' Unlawful Voter Initiative. As a naturalized citizen, the Unlawful Voter Initiative subjects Member A to discriminatory treatment in the form of enhanced voter eligibility scrutiny on the basis of their citizenship status, an injury in and of itself. And because of the inaccuracies in the data underlying the Initiative, the Initiative threatens to mistakenly identify Member A as an unlawful noncitizen voter. These mistakes, in turn, subject Member A to potential deprivation of their constitutional right to vote.

19. Member A also reasonably fears that DHS will create a TECS record about them because of Defendants' Unlawful Voter Initiative, resulting in myriad additional consequences such as limitations on their ability to travel.

20. Plaintiff OCA-San Mateo is a volunteer-run, membership organization headquartered in San Mateo, California, with members residing largely in San Mateo County. OCA-San Mateo has a board elected by its membership. Its usual organizational activities include community outreach, especially concerning voter education, through distribution of translated election materials.

21. OCA-San Mateo's members include naturalized citizens, at least two of whom are

[10] *See Derivative Citizenship*, USCIS, https://www.uscis.gov/glossary-term/51205 [https://perma.cc/ZTS9-UG2Y].

qualified, registered voters who vote regularly and intend to vote in upcoming elections. Neither member registered to vote or cast a ballot prior to their naturalization.

22. OCA-San Mateo's naturalized citizen members are harmed by Defendants' Unlawful Voter Initiative. As naturalized citizens, the Unlawful Voter Initiative subjects them to discriminatory treatment in the form of enhanced voter eligibility scrutiny on the basis of their citizenship status, an injury in and of itself. And because of the inaccuracies in the data underlying the Initiative, the Initiative threatens to mistakenly identify these OCA-San Mateo members as unlawful noncitizen voters. These mistakes, in turn, subject these members to potential deprivations of their constitutional rights to vote.

23. OCA-San Mateo's naturalized citizen members also reasonably fear that DHS will create TECS records about them because of Defendants' Unlawful Voter Initiative, resulting in myriad additional consequences including limitations on their ability to travel.

24. Plaintiff OCA-Sacramento is a nonpartisan regional chapter of OCA-Asian Pacific American Advocates based in Sacramento, California. It is a volunteer-run membership organization. These members elect the board of OCA-Sacramento.

25. OCA-Sacramento's members include naturalized citizens. These members are qualified, registered voters who vote regularly and intend to vote in upcoming elections. These naturalized citizens did not register to vote or cast a ballot until after their respective naturalizations.

26. These naturalized citizen members of OCA-Sacramento are harmed by Defendants' Unlawful Voter Initiative. As naturalized citizens, the Unlawful Voter Initiative subjects them to discriminatory treatment in the form of enhanced voter eligibility scrutiny on the basis of their citizenship status, an injury in and of itself. And because of the inaccuracies in the data underlying the Initiative, the Initiative threatens to mistakenly identify these OCA-Sacramento members as unlawful noncitizen voters. These mistakes, in turn, subject these members to potential deprivations of their constitutional right to vote.

27. Plaintiff Common Cause is a nonpartisan, grassroots organization organized under the laws of the District of Columbia that has a mission of upholding the core values of American democracy. Common Cause works to create open, honest, and accountable government that serves

the public interest; promotes equal rights, opportunity, and representation for all; and empowers all people to make their voices heard in the political process. Common Cause has nearly 1 million members, including more than 134,000 members in California, 22 state offices, and a presence in all 50 states and the District of Columbia. It has members in every congressional district. Since its founding by John Gardner fifty years ago, Common Cause has been dedicated to making government at all levels more representative, open, and responsive to the interests of ordinary people.

28. Among Common Cause's members are numerous naturalized and derivative U.S. citizens, including Member 1, Member 2, Member 3, Member 4, Member 5, Member 6, Member 7, and Member 8.

29. Members 1, 2, and 3 all reside in California and are naturalized U.S. citizens. Members 1 and 2 are registered voters, regularly vote, have voted in the November 3, 2026, midterm election, and intend to vote in future elections. Member 3 is a registered voter, regularly votes, and intends to vote in the November 3, 2026, midterm election and other future elections. Members 1, 2, and 3 did not register to vote or cast a ballot prior to acquiring U.S. citizenship.

30. Member 4 resides in Virginia and is a naturalized U.S. citizen. Member 4 is a registered voter, regularly votes, and intends to vote in upcoming elections. Member 4 did not register to vote or cast a ballot prior to acquiring U.S. citizenship.

31. Member 5 resides in Washington state and is a naturalized U.S. citizen. Member 5 is a registered voter, regularly votes, has already voted in the November 3, 2026, midterm election, and intends to vote in future elections. Member 5 did not register to vote or cast a ballot prior to acquiring U.S. citizenship.

32. Member 6 resides in Connecticut and is a naturalized U.S. citizen. Member 6 is a registered voter, regularly votes, has already voted in the November 3, 2026, midterm election, and intends to vote in future elections. Member 6 did not register to vote or cast a ballot prior to acquiring U.S. citizenship.

33. Member 7 resides in New York and is a naturalized U.S. citizen. Member 7 is a registered voter, regularly votes, has already voted in the November 3, 2026, midterm election, and intends

to vote in future elections. Member 7 did not register to vote or cast a ballot prior to acquiring U.S. citizenship.

34. Member 8 resides in Colorado and is a naturalized U.S. citizen. Member 8 is a registered voter, regularly votes, has already voted in the November 3, 2026, midterm election, and intends to vote in future elections. Member 8 did not register to vote or cast a ballot prior to acquiring U.S. citizenship.

35. Common Cause Members 1 through 8 are harmed by Defendants' Unlawful Voter Initiative. As naturalized citizens, the Unlawful Voter Initiative subjects them to a discriminatory treatment in the form of enhanced voter eligibility scrutiny on the basis of their citizenship status, an injury in and of itself. And because of the inaccuracies in the data underlying the Initiative, the Initiative threatens to mistakenly identify these members as unlawful noncitizen voters. These mistakes, in turn, subject these members to potential deprivations of their constitutional right to vote.

36. Common Cause Members 1 through 8 also reasonably fear that DHS will create TECS records about them because of Defendants' Unlawful Voter Initiative, resulting in myriad additional consequences including limitations on their ability to travel.

37. Defendant United States Department of Homeland Security (DHS) is a Cabinet-level department in the federal government and is an "agency" within the meaning of 5 U.S.C. § 551(1). Its component agencies include U.S. Citizenship and Immigration Services (USCIS); U.S. Immigration and Customs Enforcement (ICE), which includes Homeland Security Investigations (HSI); U.S. Customs and Border Protection (CBP), which oversees the U.S. Border Patrol; and the Federal Protective Services (FPS).

38. Defendant Markwayne Mullin is the Secretary of Homeland Security. He is sued in his official capacity.

39. Defendant USCIS is a federal agency within the meaning of 5 U.S.C. § 551(1). It is a component agency of DHS, and it oversees the naturalization process for citizenship to the United States, determines U.S. citizenship eligibility, and provides U.S. citizenship documentation upon request for individuals who acquired or derived U.S. citizenship through their parents.

40. Defendant Joseph B. Edlow is the Director of USCIS. He is sued in his official capacity.

## JURISDICTION AND VENUE

41. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(4) (civil rights and elective franchise) because Plaintiffs seek to secure equitable and other relief under an Act of Congress providing for the protection of the right to vote.

42. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers of the United States acting in their official capacities and agencies of the United States and Plaintiff OCA-San Mateo resides in this District and no real property is involved in the action.

43. This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

## DIVISIONAL ASSIGNMENT

44. This case may be assigned to the San Francisco Division or any division of this Court pursuant to N. D. Cal. Civ. L.R. 3-2(c) because the action arises in various locations within this district, including San Mateo County.

## FACTS

45. President Trump has repeatedly and falsely asserted that noncitizens are voting in significant numbers and has used those claims to call for increased federal involvement in election administration.

46. Earlier this year, President Trump asserted for the first time that DHS had identified "approximately 278,000 non-citizens who are registered to vote in federal elections" and that "the real number [was] actually much higher than that" because "[d]emocrat states [sic] refuse to share their voter files."[11]

47. DHS officials have acted on these unsupported claims of widespread noncitizen voting. For example, Defendant Mullin repeated the President's claim that DHS has identified "over

[11] Zachary B. Wolf & Annette Choi, *Trump's Speech Claiming US Election Vulnerabilities, Annotated*, CNN (July 17, 2026), https://www.cnn.com/interactive/2026/07/politics/annotated-transcript-trump-speech-us-election-vis/ [https://perma.cc/Z2AY-9TEK].

250,000 noncitizens registered to vote" in four states, even though he acknowledged in the same press release that this estimate was based on a "preliminary review" of unspecified records.[12]

48. DHS has specifically acknowledged the inaccuracy of this data. For example, while initially claiming in July that Nevada had 16,000 noncitizens on its rolls, a month later DHS said it had actually flagged only 185 such individuals, and the agency has reportedly refused to identify those individuals in communications with state election officials.[13] Nevada confirmed a month later that every single person on DHS's list was a lawfully registered citizen.[14]

49. In July 2026, Defendant Mullin also asserted in a letter to the California Secretary of State that over 190,000 registered voters in California "may be" noncitizens. But then, in an October 13, 2026, letter to the Los Angeles County Recorder, Defendant Mullin revised that figure to 20,000, without explaining why DHS was no longer alleging that an additional 170,000 California voters were noncitizens.[15]

50. These assertions of noncitizen voting by federal officials are also contradicted by all available evidence, which indicates that noncitizen voting is exceptionally rare.

51. Recent state audits have shown that incidents of noncitizens registered to vote continue to be extraordinarily rare, isolated occurrences.[16] Other sources also confirm that the number of

---

[12] Press Release, U.S. Dep't of Homeland Sec., DHS Secretary Markwayne Mullin Sends Letter to Secretaries of State Warning About Non-Citizens on Voter Rolls (July 17, 2026), https://www.dhs.gov/news/2026/07/17/dhs-secretary-markwayne-mullin-sends-letters-secretaries-state-warning-about-non [https://perma.cc/YW5A-7EBY].

[13] Jude Joffe-Block & Miles Parks, *DHS Acknowledges the Noncitizen Numbers It Touted on Voter Rolls Were Inflated*, NPR (Aug. 25, 2026), https://www.npr.org/2026/08/25/nx-s1-5940807/noncitizen-voters-trump-nevada-call [https://perma.cc/T22F-L4F2].

[14] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html [https://perma.cc/YV8B-VQ5G]

[15]Letter from R. Tren McCotter, Acting Deputy Att'y Gen., U.S. Dep't of Just., to Dean C. Logan, Registrar-Recorder / Cnty. Clerk, L.A. Cnty. (Oct. 13, 2026), https://www.documentcloud.org/documents/28812869-october-13-doj-letter-to-los-angeles-county-on-alleged-noncitizen-voting/ [https://perma.cc/PZ4W-27B4]; *see also* Letter from Shirley N. Weber, Sec'y of State, State of Cal., to R. Trent McCotter, Acting Deputy Att'y Gen., U.S. Dep't of Just. (Oct. 15, 2026), https://admin.cdn.sos.ca.gov/pdf/other/casos-to-doj-101526.pdf [https://perma.cc/S72F-MQK7].

[16] Stephen Richer, *Another Data Point Against the Theory That Noncitizens Are Voting En Masse*, Cato at Liberty (May 14, 2026), https://www.cato.org/blog/another-data-point-against-theory-non-citizens-are-voting-en-masse [https://perma.cc/H36B-NU8V] (noting Utah's recent audit of

potential noncitizen registered voters identified is negligible. According to the *Texas Tribune,* when seven states with a total of 35 million registered voters reviewed their voter rolls using the recently modified SAVE database, the states identified just 0.01% of those 35 million voters as potential noncitizens.[17]

52. Another recent analysis of claims of noncitizen voting showed that even "the largest claims never identify a number of possible noncitizen registrants or voters that amounts to more than roughly one-tenth of one percent of the number of active registered voters in a state."[18]

53. Despite scant evidence of noncitizen voting in U.S. elections, Defendants have undertaken a significant effort, involving hundreds of their own agents, to investigate naturalized and derivative citizens' voting qualifications through the Unlawful Voter Initiative.

54. On September 13, 2026, Senators Alex Padilla and Charles Schumer submitted correspondence to Defendants Mullin and Edlow concerning a whistleblower report that had been brought to their attention, attaching a summary of the whistleblower's report, which provided an inside look into the Unlawful Voter Initiative and "serious allegations of illegal and inappropriate activities within" USCIS's Fraud Detection and National Security Directorate (FDNS) related to the Initiative.[19]

55. The Unlawful Voter Initiative tasks FDNS agents with conducting voter eligibility investigations that proceed, broadly, in three steps: First, using a combination of unnamed and

---

2.1 million voters identified one noncitizen registered and Pennsylvania's audit of 210,905 voters identified one noncitizen registered who had never voted, is no longer registered, and no longer lives in Pennsylvania).

[17] Jen Fifield & Zach Despart, *A Federal Tool to Check Voter Citizenship Keeps Making Mistakes. It Led to Confusion in Texas*, Tex. Trib. (Feb. 13, 2026), https://www.texastribune.org/2026/02/13/save-voter-citizenship-tool-mistakes-confusion/ [https://perma.cc/X6B6-4GFY ].

[18] *Claims of Noncitizen Registration or Voting: Analysis and Tracker*, Ctr. for Election Innovation & Rsch. (Sept. 2026), https://electioninnovation.org/research/claims-noncitizen-registration-voting-analysis-track [https://perma.cc/X6LJ-GCYJ]; *see also Four Things to Know About Noncitizen Voting*, Bipartisan Policy Ctr. (July 22, 2026) https://bipartisanpolicy.org/article/four-things-to-know-about-noncitizen-voting/ [https://perma.cc/GQE8-C5DM].

[19] Letter from Sen. Alex Padilla et al. to Markwayne Mullin, Sec'y, U.S. Dep't. of Homeland Sec. (June 8, 2026), https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf [https://perma.cc/888X-C597].

unverified government data sources, DHS generates a dubious list of voters it suspects have registered or voted illegally in the past as noncitizens, the DHS List, and provides this list to USCIS agents for further review. Second, DHS directs agents in FDNS to use voters' PII, found on the DHS List, to illegally access state voter registration portals and obtain or verify an individual's voting history. And third, despite known issues with the DHS List, DHS directs agents to create TECS records for individuals who, based on this process, agents purport to be unlawful voters.

**DHS Generates a Dubious List of Allegedly Unlawful Voters.**

56. Defendants' collection of PII is strictly controlled by internal rules intended to protect such sensitive information from improper collection and disclosure. Both agency Defendants are subject to DHS's Fair Information Practice Principles (FIPPs), incorporated in DHS's Handbook for Safeguarding Sensitive PII and USCIS's Policy Manual, respectively.

57. These documents designate Social Security numbers and other PII in conjunction as "sensitive," restricting DHS personnel from collecting or maintaining them unless personnel confirm and assert the proper legal authorization.

58. On August 21, 2026, USCIS-FDNS agents received instructions "to stop everything being worked on and immediately watch a 1 hour 45 minute training video."[20]

59. This training introduced USCIS-FDNS agents to the Unlawful Voter Initiative. The agents were provided the DHS List, which contains the PII of hundreds of thousands of individuals throughout all 50 states.[21] That PII includes, among other information, their dates of birth, Social Security numbers, and A-Numbers.[22] It also, sometimes, purports to contain data related to their voting history, such as when they registered to vote and the elections they have voted in.[23]

60. The specifics of how the DHS List was generated remain unknown. DHS has yet to disclose all the data sources it used to put the DHS List together. The agency also has not demonstrated that the database-matching process used to create the DHS List was reliable nor has it stated whether the Data Integrity Board of DHS, or of other federal agencies whose databases were used

[20] Whistleblower Disclosure at 1.
[21] Whistleblower Disclosure at 1.
[22] Whistleblower Disclosure at 14, 18–19, 24–25.
[23] Whistleblower Disclosure at 14–15.

to compile the list, determined that the information used was accurate. DHS has also not described what procedures, if any, were used to verify the information provided.

61. When FDNS agents directly questioned USCIS officials about the DHS List's sources during the training, they received "generalized or canned" statements in response.[24]

62. Based on the training materials, however, the whistleblower could at least gather that, among other sources of information, the DHS List draws on data from the Department of State, the Social Security Administration, the Department of Justice (DOJ), and commercial databases such as Accurint and CLEAR.[25]

63. On information and belief, the federal government has used public voter files and commercial databases to implement its Unlawful Voter Initiative because it lacks access to many states' non-public voter files. Indeed, since May 2025, the federal government has been engaged in an unsuccessful effort to compel thirty states and Washington, D.C. to hand over their non-public voter files to the federal government.[26]

64. But, as election officials and experts have explained, database matching across disparate government and commercial databases is inaccurate and rife with errors. As just one example, because many individuals share the same or similar names, matching across multiple databases by name often leads to false matches.[27] And commercial databases, such as Accurint, by their own admission, do not always contain complete records, inviting users to review "partial" records.[28]

---

[24] Whistleblower Disclosure at 15.

[25] Whistleblower Disclosure at 18, 25.

[26] *See United States v. Simon*, No. 25-cv-3761, 2026 WL 2389778, at *1 (D. Minn. Aug. 17, 2026) (noting that "federal courts in Michigan, Oregon, California, Maryland, Colorado, Wisconsin, Maine, Arizona, Rhode Island, Massachusetts, New Mexico, Illinois, New Jersey, Kentucky, Virginia, New York, New Hampshire, Connecticut, Pennsylvania, West Virginia, the District of Columbia, and Nevada have dismissed [DOJ's] claims demanding production of unredacted statewide voter registration lists."); *see also id.* *13 (dismissing same claim in Minnesota); *Common Cause v. U.S. Dep't of Just.*, No. 26-cv-1352, 2026 WL 3033772, at *5 n.3 (D.D.C. Oct. 9, 2026) (collecting cases).

[27] *See* Jasleen Singh, *Watch Out for False Voter Fraud Claims Fueled by SAVE Program*, Brennan Ctr. for Just (June 12, 2026), https://www.brennancenter.org/our-work/research-reports/watch-out-false-voter-fraud-claims-fueled-save-program [https://perma.cc/2FAN-2JX9].

[28] *Accurint for Legal Professionals Overview*, LexisNexis (2013), https://www.lexisnexis.com/pdf/LexisNexis_Accurint-for-Legal-Professionals_Overview.pdf [https://perma.cc/UR83-F5K9].

The protocols used for carrying out the Unlawful Voter Initiative are accordingly not a reliable method to determine a given individual's voter history.[29]

65. The DHS List also draws from the "Systematic Alien Verification for Entitlements" (SAVE) system,[30] an online service maintained by USCIS that aggregates immigration data and is intended to be used to verify the citizenship status of applicants for public benefits or licenses.[31] But multiple sources have reported that SAVE, like the commercial databases DHS is using, is riddled with inaccuracies.[32]

66. The federal government itself has confessed to "limitations on SAVE's ability to verify citizenship," especially for citizens who acquired their citizenship later in life, such as through naturalization or a form of derived citizenship, like the naturalization of a parent.[33] As it turns out, these are precisely the kind of citizens Defendants are targeting through their Unlawful Voter Initiative.

67. Indeed, as USCIS admitted in the training, the DHS List includes U.S. citizens.[34] Part of the goal of its Unlawful Voter Initiative is to try and uncover instances of persons who acquired citizenship later in life purportedly voting or registering to vote before they became citizens.[35]

68. All the voters in the DHS List each had assigned A-Numbers.[36]

69. U.S.-born citizens are not assigned A-Numbers.

---

[29] Kristina Cooke & Peter Eisler, *White House Pushes for Speedy Review of Voter Rolls in Hunt for Noncitizen Voters*, Reuters (Sep. 24, 2026), https://www.reuters.com/legal/government/white-house-pushes-speedy-review-voter-rolls-hunt-noncitizen-voters-2026-09-24/ [https://perma.cc/4HPS-EF65].

[30] Whistleblower Disclosure at 18.

[31] *SAVE*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/save [https://perma.cc/XD2N-25EF].

[32] *See, e.g.*, Jasleen Singh, *Watch Out for False Voter Fraud Claims Fueled by SAVE Program*, Brennan Ctr. for Just. (June 12, 2026), https://www.brennancenter.org/our-work/research-reports/watch-out-false-voter-fraud-claims-fueled-save-program [https://perma.cc/A8UA-LQSN].

[33] *Common Cause v. U.S. Dep't of Just.*, No. 26-cv-01352-SLS, 2026 WL 3033772, at *6 & n.5 (D.D.C. Oct. 9, 2026).

[34] Whistleblower Disclosure at 24–25.

[35] Whistleblower Disclosure at 24 (Unlawful Voter Initiative PowerPoint Presentation Slide instructing that "[i]f status shows [U.S. citizen]," agents should "compare the voter registration date/date of voting to the date of naturalization.")

[36] *A-Number / Alen Registration Number / Alien Number (A – Number or A#)*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/glossary-term/50684 [https://perma.cc/4XQD-FTRB].

70. The Unlawful Voter Initiative therefore subjects naturalized and derivative citizens to investigatory scrutiny related to voting qualifications that natural-born citizens do not face, in violation of the Uniform Standards Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A).

71. The A-Numbers in the DHS List have also been suspiciously gathered. According to the training, the A-Numbers were not sourced from the other data inputs DHS relied on. Instead, they were, in Defendants' own words, "brought in through supplemental magic."[37] And that "supplemental magic," Defendants admitted, is error-prone, for it sometimes associates a single individual with multiple A-Numbers.[38] "Magic" is not a reliable source for identifying potential noncitizen voters.

72. Agents were similarly instructed in the training that they should "not rely on" the Social Security numbers associated with individuals on the list because those numbers "may not be accurate."[39]

73. Defendants also acknowledged in the training that "it can be very difficult to determine if a subject is a U.S. citizen or not," and that "[t]here is no single, clear data source to confirm that a subject is a U.S. citizen."[40]

74. By Defendants' own admission, and as the whistleblower discovered, data that forms the basis of their Unlawful Voter Initiative is inaccurate.[41]

75. Despite admissions like these, agents were given explicit instructions to *assume* the DHS List was accurate enough to complete the assigned task—make determinations about certain individuals' eligibility to vote.[42]

**FDNS Agents Are Directed to Illegally Access State Voter Registration Portals.**

76. As part of the Unlawful Voter Initiative training, DHS also instructed FDNS agents to illegally access state voter registration portals under the guise of impersonating individual voters. It ordered these actions purportedly to supplement and verify the voting history data DHS obtained

---

[37] Whistleblower Disclosure at 19.
[38] Whistleblower Disclosure at 19.
[39] Whistleblower Disclosure at 24.
[40] Whistleblower Disclosure at 26.
[41] Whistleblower Disclosure at 20.
[42] Whistleblower Disclosure at 15.

from the commercial databases.

77. DHS provided agents with a link to the internal USCIS-FDNS website for the Initiative, which contains a list of all fifty states and corresponding links to each state's official voter registration website.[43]

78. These voter registration websites each contain portals largely intended to be used only by voters, or those authorized to act on their behalf, to look up their own registration details and voting history. DHS, however, instructed its agents to use the PII obtained from the dubious DHS List to impersonate voters and search a state's voter registration site for the targeted individual's purported voting data.[44]

79. In some states, this conduct required agents to violate a voter registration portal's clear access restrictions by explicitly, and falsely, attesting or certifying that the agent was the voter in question or acting with the voter's authorization.[45]

80. In fact, the Unlawful Voter Initiative training explicitly instructed agents that they would have to make these false attestations to access voter information from the online portals for Florida, Virginia, and Massachusetts.[46]

81. For example, Virginia's online voter registration portal requires users to input their First Name, Last Name, Date of Birth, Last Four Digits of their Social Security number, and the county in which they are registered to vote. Users are then required to "certify and affirm that the information provided to access [their] voter registration is [their] own or [they are] expressly authorized by the voter to access this information," and to acknowledge that they understand that "it is unlawful to access the record of any other voter, punishable as computer fraud under Va. Code § 18.2-152.3."[47] Arizona's online portal requires users to make a similar declaration.[48]

---

[43] Whistleblower Disclosure at 1–2.
[44] Whistleblower Disclosure at 4.
[45] Whistleblower Disclosure at 5–7.
[46] Whistleblower Disclosure at 7.
[47] *What You Can Do as a Registered Voter Using This Portal*, Va. Dep't of Elections (2026), https://vote.elections.virginia.gov/VoterInformation/Lookup/status [https://perma.cc/5GSQ-7B8V].
[48] *Search By Voter*, Ariz. Voter Info. Portal, https://my.arizona.vote/WhereToVote.aspx?s=individual [https://perma.cc/7F96-TN2S] ("I declare under penalty of perjury that I am

82. Massachusetts's online portal similarly requires users to input their First Name, Last Name, Date of Birth, and Residential Zip Code. Users are then required to affirmatively acknowledge that they "understand and agree" that "[t]his webpage is intended for use by the individual voter to determine their voter registration status."[49] The online voter portals of Florida and Georgia also require users to attest to similar statements when inputting voter information to access a voter's records.[50]

83. Other states also make clear on their websites that their voter registration portals are intended to be accessed only by the voter who is accessing the portal. For example, California's portal instructs users that "[t]o find *your* record, *you* will need to enter some personal information," and that users should enter "both *your* DL/ID and last four digits of *your* social security number."[51] On information and belief, forty-three states use language like this on their voter registration lookup portals to explicitly or implicitly restrict data access to voters, or those authorized to access the data on their behalf, searching for their own records.

84. During the training, agents expressed concerns about accessing other persons' information on these websites, in violation of the websites' access restrictions.[52] The Office of the Chief Counsel (OCC) at DHS, however, advised them that it was "perfectly ok" for them to use the websites in this manner and that they would not be "personally liable for conducting these searches

---

an individual voter seeking my own registration information, or that I am seeking a voter's information with the voter's express permission, and that I am using this tool only for purposes permissible under Arizona law. See A.R.S. § 16-168.")

[49] *Find My Voter Registration Status*, Sec'y of the Commonwealth of Mass. William Francis Galvin, https://www.sec.state.ma.us/VoterRegistrationSearch/ [https://perma.cc/KPU3-QYFC].

[50] *Voter Information Lookup*, Fla. Dep't of State, https://registration.dos.fl.gov/CheckVoterStatus [https://perma.cc/FAL8-LMQC] (Users must check a box stating that they "understand and agree" that "This website is intended for use by a registered voter to determine his or her voter registration and voting status. It is unlawful to knowingly alter another person's voter registration information or to attempt, assist with, or otherwise commit fraud in connection with the right to vote. See §§ 104.011, 104.041, and 104.41, Fla. Stat."); *Welcome to GA My Voter Page*, My Voter Page, https://mvp.sos.ga.gov/s/ [https://perma.cc/JN9M-QSNW] ("By clicking submit, you acknowledge that you are the voter or the voter's designee and have the voter's express permission to access their information.")

[51] *Welcome!*, Shirley N. Weber, Ph.D. Cal. Sec'y of State, https://voterstatus.sos.ca.gov/ [https://perma.cc/B2YX-SSYL](emphasis added).

[52] Whistleblower Disclosure at 11.

when done as part of their official duties and properly documented,"[53] stating that agents were acting at the full direction of DHS under an official program. In full, DHS's Unlawful Voter Initiative training instructed that "OCC advises that it is permissible for Immigration Services Officers and Immigration Officers to use these state voter websites for purposes of confirming voter registration status as it pertains to an alien's eligibility for an immigration benefit."[54]

85. The agents' unauthorized access to the state voter registration websites not only violates the laws of many states; it also violates USCIS's own Rules of Behavior. Those rules provide that every USCIS employee must acknowledge and abide by a System Access section that says, "I will not attempt to access systems I am not authorized to access," and further says, "I will not attempt to bypass access control measures."[55]

86. Notwithstanding all of this, agents were directed to proceed through the inquiries at breakneck pace. According to the whistleblower, they were "given a quota of at least five subjects to be reviewed per hour and 40 subjects per day."[56] Given a minimum quota of five reviews per hour, agents can spend no more than twelve minutes determining whether a targeted individual purportedly ever voted or registered to vote unlawfully.

**Agents Create TECS Records After Rushed Investigations.**

87. If, based on their (at most) twelve-minute inquiry, an agent believes that a subject is an unlawful voter, then the Initiative requires that they create a TECS record about the individual flagging the individual for a purported legal violation.[57]

88. The TECS records, which are located in the TECS system, include law enforcement records that are used in field operations and can have significant consequences for individuals marked as

---

[53] Whistleblower Disclosure at 12–13.
[54] Whistleblower Disclosure at 12.
[55] Whistleblower Disclosure at 13; *see also* U.S. Dep't of Homeland Sec., DHS 4300A, "Information Technology System Security Program, Sensitive Systems" Attachment G Rules of Behavior, Appendix: DHS General Information System Rules of Behavior, A-1, A–2 (Apr. 28, 2022), https://www.dhs.gov/sites/default/files/2023-06/4300A%20ITSSP%20SS%20Attachment%20G%20%20Rules%20of%20Behavior.pdf [https://perma.cc/4CLL-EEN6].
[56] Whistleblower Disclosure at 1.
[57] Whistleblower Disclosure at 1.

illegal voters.[58] TECS is owned and managed by CBP, though other agencies create, access, and use TECS records. TECS records may be used for primary and secondary border screenings, "lookouts" conducted by CBP at ports of entry, and even criminal arrests.[59]

89. When an agency with access to TECS suspects an individual of violating a law, they may create a "Lookout" record about the individual in TECS.[60] On information and belief, because the Unlawful Voter Initiative requires FDNS agents to determine whether an individual unlawfully voted in the past as a noncitizen and then create TECS record about purported noncitizen voters, the Unlawful Voter Initiative is causing the creation of Lookout records.

90. Agents are regularly creating these TECS records based solely on the unreliable data provided in the DHS List.[61] The whistleblower report indicates that "[w]hen explicitly asked if officers could complete the assignment without creating TECS records that rely solely on the DHS source data for voter registration and/or voting dates, officers were told 'no' by FDNS leadership."[62] This means that FDNS agents are required "to create a TECS under their own name that they may believe to be inaccurate or false due to reasonable reliability concerns with the DHS data."[63]

91. Defendants, in other words, require FDNS agents to treat the DHS-provided data as accurate,[64] despite repeatedly acknowledging flaws in that same data during the Unlawful Voter Initiative training.

92. This slapdash process has resulted in the creation of TECS records about naturalized and derivative U.S. citizens based on purported unlawful voting history,[65] after nothing more than twelve minutes of sifting through unreliable, inaccurate data and illegally accessed state voter registration portals pertaining to any individual.

---

[58] U.S. Dep't of Homeland Sec., DHS/CBP/PIA-021, Privacy Impact Assessment for the TECS System: Platform 11–12, 18 (Aug. 12, 2016), https://www.dhs.gov/sites/default/files/2022-05/privacy-pia-cbp-tecs%20platform-april2022.pdf [https://perma.cc/6AX7-V53N].
[59] *Id.*
[60] *Id.*
[61] Whistleblower Disclosure Cover Letter at 3.
[62] Whistleblower Disclosure at 20.
[63] Whistleblower Disclosure at 20.
[64] Whistleblower Disclosure at 24.
[65] Whistleblower Disclosure Cover Letter at 3.

93. TECS records indicating a violation of law have concrete and dangerous consequences for these individuals in many facets of their lives. When an individual with a Lookout record encounters CBP at a port of entry, their Lookout record can cause CBP to take them in for further interrogation or even apprehend them.[66]

94. TECS records are also used by DHS and partner federal agencies for government benefit eligibility determinations in that the existence of certain Lookout TECS records about an individual can lead to the denial of benefits to that person.[67] For example, an individual with a certain type of TECS record about them could lose eligibility for "trusted traveler" programs, which allow for expedited processing at airports and other ports of entry.[68]

95. Thus, through its unlawful creation of TECS records, the Unlawful Voter Initiative is creating direct, immediate, and unjustified consequences for thousands of individuals, including naturalized and derivative citizens, such as Plaintiffs' members.

**The Federal Government Demands States Deny Eligible Voters Their Ballots.**

96. The federal government, including DHS, is using information generated by the Unlawful Voter Initiative to demand that states refuse to send ballots to voters identified on the flawed DHS List as purportedly "likely noncitizen[]" voters; to segregate ballots received from those voters; and/or to refuse to count ballots from those voters until their citizenship is "verified," with no specifics on when or how that will be done.[69] The Unlawful Voter Initiative therefore threatens to deny individuals, including Plaintiffs' members, their constitutional right to vote.

97. On October 15, 2026, the United States sued the state of California over California's voter list after DOJ, "working with" Defendant DHS, claimed to have identified 20,000 people on California's voter rolls who have received or will receive mail ballots from California but who the

---

[66] Privacy Impact Assessment 12, 18.

[67] *Id.* at 19, 25–26.

[68] GAO, Trusted Traveler Programs: DHS Has Enrollment Processes, but CBP Should Provide Additional Information on Reconsiderations 15–16 & n.23, 49 (Feb. 2024), https://www.gao.gov/assets/gao-24-106314.pdf [https://perma.cc/2LAU-KSLZ].

[69] Compl. at 14–15 , *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 15, 2026), Dkt. No. 1.

federal government believes are unlawful noncitizen voters.[70]

98. That action, *United States v. California*, No. 26-cv-12025, is currently pending in the U.S. District Court for the Central District of California. There, the federal government has explained that its list of 20,000 purported noncitizen voters in California was developed, in part, by USCIS and FDNS.[71] On information and belief, this is in reference to the DHS List created under the Unlawful Voter Initiative.

99. And in that action, the federal government has requested a preliminary and permanent injunction preventing California from "tabulating in federal elections vote-by-mail ballots received from individuals identified by the Federal Government as likely noncitizens until those individuals' citizenship status can be verified."[72]

100. Factual development in that action has further revealed the inaccuracies in the data underlying the Unlawful Voter Initiative. As explained by one declarant, after receiving the federal government's list of 20,000 purported noncitizen California voters, Los Angeles County officials compared a sample of the 20,000 individuals with their own voter records. And that comparison showed that of the sampled individuals that indicated a place of birth, 38.9% recorded a place of birth in the United States, a strong indicator of citizenship status; separately, of all the sampled individuals, 71.2% had never voted; and 47.5% either had canceled their voter registrations or were inactive voters, meaning they had been flagged by the Los Angeles County systems as having an issue in their records, such as not voting, mail being undeliverable, or failure to respond to a confirmation notice.[73] Significant percentages of these individuals the Unlawful Voter Initiative has identified as unlawful noncitizen voters are thus either not voters at all or are U.S.-citizens, as the whistleblower forecasted.

101. Defendants continue to acknowledge the unreliable nature of this data in the litigation, just

---

[70] *United States Sues California After Determining More Than 20,000 Likely Noncitizens Are Registered to Vote in the Golden State*, U.S. Dep't of Just. (Oct. 15, 2026), https://www.justice.gov/usao-cdca/pr/united-states-sues-california-after-determining-more-20000-likely-noncitizens-are [https://perma.cc/Y4RN-SA69]; *see also* Compl., *United States v. California*, No. 26-cv-12025 (C.D. Cal. Oct. 15, 2026), Dkt. No. 1.

[71] Compl. at 8–10, *California*, No. 26-cv-12025, Dkt. No. 1.

[72] Compl. at 14, *California*, No. 26-cv-12025, Dkt. No. 1.

[73] Decl. of Aman Bhullar at 10–11, *California*, No. 26-cv-12025, Dkt. No. 32-3.

as they did during the Unlawful Voter Initiative Training. For example, Nicolas Bartell, the Associate Director of FDNS at USCIS, stated in a declaration that the data in the DHS List "may be incomplete, outdated, or mismatched."[74] Again, despite these acknowledged limitations, Defendants instructed FDNS agents to treat the DHS List as accurate and reliable, and to create TECS records about individuals based solely on the data in the DHS List.[75]

102. The federal government has also confirmed what the whistleblower reported: The Unlawful Voter Initiative is sweeping in U.S. citizens. In a press conference connected to the litigation, Acting United States Deputy Attorney General R. Trent McCotter stated that "[t]here may be some names," on the list of 20,000 purportedly unlawful noncitizen California voters generated by the Unlawful Voter Initiation, "who it turns out ultimately are citizens. We're not perfect."[76] Yet still, the federal government demands that California refuse to count ballots received from individuals on this list.

103. California is not the only state that may be subject to such demands. On October 26, only days before the November election, the federal government demanded that Washington state set aside ballots from 405 voters it claimed are noncitizens.[77]

104. Furthermore, on information and belief, the federal government is actively considering making the same demands, through litigation, of other states that have begun to mail ballots to all registered voters in the state.[78] Such litigation could ensue before the November 3, 2026 midterm

---

[74] Decl. of Nicolas Bartell at 3–4, *California*, No. 26-cv-12025, Dkt. No. 22-4.

[75] Whistleblower Disclosure at 20, 24.

[76] Video posted by Gov. Newsom Press Office (@govpressoffice.gov.ca.gov), BlueSky, *WOW. Trump's #2 at DOJ just admitted this: "There may be some names on there who it turns out ultimately are citizens. We're not perfect."*, at 00:06–00:12 (Oct. 19, 2026) https://bsky.app/profile/govpressoffice.gov.ca.gov/post/3myaqlptqnc2i [https://perma.cc/D56T-59V3].

[77] Letter from Charles Neil Floyd et al., Acting U.S. Att'y for the W.D. Wash., U.S. Dep't of Just., to Hon. Steve Hobbs, Sec'y of State, Wash. (Oct. 26, 2026), https://www.democracydocket.com/wp-content/uploads/2026/10/signed-letter-to-steve-hobbs-re-non-cit-ballots.pdf [https://perma.cc/HU6M-AXFL]; Gene Johnson & Rebecca Boone, *Trump Administration Asks Washington To Set Aside Ballots From 400 Voters It Says May Be Noncitizens*, AP (Oct. 26, 2026), https://apnews.com/article/washington-noncitizen-voting-63c17a3eadc9ed232fbd897afbd29b9d [https://perma.cc/ZGG3-8Z3S].

[78] Julia Aisnley, Ryan J. Reilly, Kelly O'Donnell & Jane C. Timm, *DOJ Weighs Election Litigation Against More States*, NBC NEWS (Oct. 21, 2026), https://www.nbcnews.com/politics/justice-department/doj-weighs-election-litigation-states-rcna604872 [https://perma.cc/FML9-RMYA].

elections or shortly thereafter. [79]

105. DHS offices in eight other states—Washington, Wisconsin, Missouri, Georgia, Pennsylvania, Nevada, New York, and Connecticut—are all also expected to see a surge in investigative scrutiny of purported unlawful voters in the weeks leading up to the November 3, 2026 midterm election.[80] And DHS documents obtained via a Freedom of Information Act request indicate the Defendants are additionally prioritizing reviews of voter records from New Jersey, Michigan, Minnesota, Ohio, Arizona, Florida, and Georgia.[81]

106. Defendants began sending armed agents to voters' doors in multiple states, including California, to ask voters about their citizenship status and whether they have registered to vote or voted in past elections. Indeed, Defendants boasted about these intimidation efforts on social media, posting photos of agents carrying firearms approaching houses and knocking on doors with captions like "AMERICAN ELECTIONS ARE FOR AMERICANS." On information and belief, the list of voters Defendants are targeting for these intimidation actions also comes from the Unlawful Voter Initiative.[82]

107. On October 21, 2026, a federal court in this district preliminarily enjoined these intimidation actions in California and eight other states, finding that they likely violate Section 11(b) of the Voting Rights Act, 52 U.S.C. § 50307(b).[83] Indeed, in doing so, the court repeatedly acknowledged these intimidation actions are based, in part, on DHS's "use of faulty data," that "is

---

[79] *Id.*

[80] Priscilla Alvarez, Tierney Sneed & Gabe Cohen, *Exclusive: DHS Plans to Launch Voter Fraud Investigation Surge Tuesday*, CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations/ [https://perma.cc/HM3G-QKMV].

[81] Letter from Marcus K. Francis, Supervisory Paralegal Specialist, U.S. Immigr. & Customs Enf't, to Hart W. Wood, Democracy Forward Found. (Oct. 1, 2026), https://democracyforward.org/wp-content/uploads/2026/10/EMBARGO-DFF-DHS-ICE-26-0510-0511-0512-LIT-A_.pdf [https://perma.cc/9QHT-JDKV].

[82] Madeline May, *Federal Agents Knock on Doors to Track Down Possible Noncitizen Voters Ahead of the Midterms*, CBS News (Oct. 21, 2026), https://www.cbsnews.com/news/federal-agents-seek-noncitizen-voters/ [https://perma.cc/PQC5-PFAY].

[83] *Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *9–10 (N.D. Cal. Oct. 21, 2026).

widely known to inadvertently include U.S. citizens . . . ."[84]

108. However, in that action, the court declined to assess the legality of the Unlawful Voter Initiative and its associated data-matching program.[85] Moreover, the preliminary injunction the court issued remains in effect only "until November 3, 2026 at 8:00 pm, or when polling places close on Election Day, or as otherwise directed by the Court."[86]

109. On information and belief, Defendants have developed and are implementing the Unlawful Voter Initiative not only for use related to the November 3, 2026 midterm election, but also for use in subsequent federal elections.

110. These demands and actions demonstrate that Defendants are not just using the Unlawful Voter Initiative to create TECS records about purported unlawful voters, they are also using it to attempt to deny individuals access to their right to vote.

## CLAIMS FOR RELIEF

### CLAIM I – Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A)

111. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

112. The Uniform Standards Provision of the Civil Rights Act provides that: "No person acting under color of law shall in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote . . . ." 52 U.S.C. § 10101(a)(2)(A).

113. When government officials engage in a policy to determine whether an individual is eligible to vote and "appl[y] different standards, practices, or procedures to naturalized citizens compared to U.S. citizens," they violate the Uniform Standards Provision of the Civil Rights Act. *Mi Familia Vota v. Fuentes*, 129 F.4th 691, 723–24 (9th Cir. 2025), *cert. granted on other grounds*,

---

[84] *Id.* at *8; *see also id.* (recognizing "the reasonable fear of citizens being wrongly swept up during [the intimidation actions] in light of the overbroad and inaccurate data sources" DHS is using).
[85] *Id.* at *2, 7, 10–11.
[86] *Id.* at *11.

*Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).

114. Defendants' Unlawful Voter Initiative violates the Uniform Standards Provision. The stated goal of the Initiative is to determine whether thousands of individuals are qualified to vote based on standards, practices, or procedures different from the standards, practices, or procedures applied to other individuals–namely, applying dubious and error-prone standards, practices, and procedures purportedly relating to their citizenship status.

115. To make that determination, Defendants have instructed their agents to investigate only lists of individuals with A-Numbers. Thus, only naturalized and derivative citizens, and not U.S.-born citizens, can be subjected to this eligibility review, as U.S.-born citizens do not have A-Numbers.

116. Accordingly, because the Unlawful Voter Initiative subjects naturalized and derivative citizens to investigative scrutiny over voting eligibility that U.S.-born citizens do not face, Defendants' policy is inconsistent with and contrary to the Uniform Standards Provision of the Civil Rights Act.

117. Courts have inherent equitable authority to review federal action alleged to be in violation of federal law. *Trump v. Cook*, 609 U.S. 528, 535 n.2 (2026) (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (holding that "plaintiffs may sue 'in equity' without a congressionally-provided cause of action" to "enforce the terms of the Federal Reserve Act.")); *see also* W. Baude, J. Goldsmith, J. Manning, J. Pfander, & A. Tyler, Hart and Wechsler's The Federal Courts and the Federal System 1348–1350 (8th ed. 2025) (noting "the availability of Ex parte Young-style litigation to challenge the legality of federal official action"); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (enforcing statutory limits on discretion of postmaster general).

118. Defendants' actions are in violation of federal statute and therefore beyond statutory authority to act.

**CLAIM II – Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A)**

**and Administrative Procedure Act, 5 U.S.C. § 706**

119. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in

this claim.

120. The Uniform Standards Provision of the Civil Rights Act provides that: "No person acting under color of law shall in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote . . . ." 52 U.S.C. § 10101(a)(2)(A).

121. When government officials engage in a policy to determine whether an individual is eligible to vote and "appl[y] different standards, practices, or procedures to naturalized citizens compared to U.S. citizens," they violate the Uniform Standards Provision of the Civil Rights Act. *Mi Familia Vota v. Fuentes*, 129 F.4th 691, 723–24 (9th Cir. 2025), *cert. granted on other grounds*, *Republican Nat'l Comm. v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).

122. Defendants' Unlawful Voter Initiative violates the Uniform Standards Provision. The stated goal of the Initiative is to determine whether thousands of individuals are qualified to vote based on standards, practice, or procedure different from the standards, practices, or procedures applied to other individuals—namely, dubious and error-prone standards, practices, and procedures purportedly relating to their citizenship status.

123. To make that determination, Defendants have instructed their agents to investigate only lists of individuals with A-Numbers. Thus, only naturalized and derivative citizens, and not U.S.-born citizens, can be subjected to this eligibility review, as U.S.-born citizens do not have A-Numbers.

124. Accordingly, because the Unlawful Voter Initiative subjects naturalized and derivative citizens to investigative scrutiny over voting eligibility that U.S.-born citizens do not face, Defendants' policy is inconsistent with and contrary to the Uniform Standards Provision of the Civil Rights Act.

125. Additionally, under the Administrative Procedure Act, courts must "hold unlawful and set aside" agency action that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or that is

"without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(A)–(D). This applies if the challenged action is not committed to agency discretion by law or otherwise unreviewable and if it constitutes final agency action or is otherwise reviewable under law. 5 U.S.C. §§ 701(a)(1)–(2), 704.

126. Defendants' Unlawful Voter Initiative is not committed to agency discretion by law and is a final agency action; is not in accordance with law; is beyond statutory authority; and is without observance of procedure required by law. It therefore violates the Administrative Procedure Act. 5 U.S.C. § 706(2).

**CLAIM III – Privacy Act, 5 U.S.C. § 552a(e)(5)**
**and Administrative Procedure Act, 5 U.S.C. § 706**

127. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

128. Under the Administrative Procedure Act, courts must hold unlawful and set aside" agency action that is "not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

129. Among other things, the Privacy Act requires that all agencies which maintain a "system of records" to: "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination . . . ." 5 U.S.C. § 552a(e)(5).

130. The DHS List maintained by Defendants as part of the Unlawful Voter Initiative constitutes a "record" within the meaning of the Privacy Act because it is an "item, collection, or grouping of information about an individual that is maintained by [Defendants] . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual . . . ." 5 U.S.C. § 552a(a)(4). The information collected and maintained pursuant to the Unlawful Voter Initiative constitutes one or more "system[s] of record" within the meaning of the Privacy Act because they are a "group of any records under the control of [Defendants] from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual . . . ." *Id.* § 552a(a)(5). Among many other pieces of identifying information, the DHS List maintained pursuant to the Unlawful Voter Initiative

contains individuals' names, A-Numbers, and Social Security numbers.

131. Under the Unlawful Voter Initiative, Defendants "maintain[]" these "record[s]" and "system[s] of records," because Defendants "maintain, collect, use, or disseminate" them. 5 U.S.C. § 552a(a)(3). Defendants have collected many kinds of sensitive PII on individuals targeted as part of the Unlawful Voter Initiative and directed their agents to use that PII to investigate targeted voters.

132. Defendants have run roughshod over their obligation to maintain the systems of records involved in the Unlawful Voter Initiative with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to [individuals] in the determination," as to whether to create a TECS record about them for suspected unlawful voting. By Defendants' and the commercial database proprietors' own admissions, data that form the basis of their Unlawful Voter Initiative is inaccurate or incomplete. Despite these admissions, they explicitly instructed their agents that the lists of suspect individuals were accurate enough to complete the assigned task, make determinations about certain individuals' eligibility to vote, and create TECS records about individuals. Defendants have thus failed to maintain the systems of record involved in the Initiative with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness," to these individuals prior to creating TECS records about them, as required by law.

133. The Initiative therefore violates the Administrative Procedure Act, 5 U.S.C § 706(2) in this manner as well, as it is not committed to agency discretion by law and is a final agency action; is not in accordance with law; is beyond statutory authority; and is without observance of procedure required by law.

**CLAIM IV– Administrative Procedure Act**

**Arbitrary and Capricious Agency Action, 5 U.S.C. § 706**

134. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

135. Under the Administrative Procedure Act, courts must hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion . . . ." 5 U.S.C. § 706(2)(A).

136. An agency action is “arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.” *Motor Vehicle Mfrs. Ass’n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

137. The Unlawful Voter Initiative constitutes arbitrary and capricious action in at least three ways.

138. First, in implementing the Unlawful Voter Initiative, Defendants are violating the Computer Fraud and Abuse Act by directing their agents to unlawfully access state voter registration portals, thereby accessing computers “without authorization or exceed[] authorized access,” and obtaining “information from any protected computer . . . .” 18 U.S.C. § 1030(a)(2)(c). “[A]ll information from all computers that connect to the Internet,” is subject to this protection. *Van Buren v. United States*, 593 U.S. 374, 379 (2021).

139. The state voter registration portals Defendants directed their agents to access are “protected computers” within the meaning of the Computer Fraud and Abuse Act. 18 U.S.C. § 1030(e)(2)(B).

140. Defendants’ agents intentionally accessed these computers when they navigated to the state voter registration websites with the intent of accessing the voter history data located on those websites.

141. They then exceeded their authorized access by falsely attesting to certifications and affirmations that they were a specific voter in question or were acting with a voter’s authorization and by ignoring clear language on the portals indicating the information on the portals is only intended to be accessed by voters looking up their own information.

142. Finally, using their unauthorized access, they obtained information from these portals in the form of voters’ registration dates and voting histories.

143. The Unlawful Voter Initiative’s call for improper use of state voter portals also violates the agencies' own Rules of Behavior, which specify that employees agree and acknowledge that they will not access systems they are not authorized to access.

144. The Unlawful Voter Initiative, as further alleged below, also violates the agencies' own internal handbooks, guidance, and policy manuals governing the use of PII.

145. Agency creation of an investigative program that requires action contrary to federal and state law and contrary to agency governing rules constitutes arbitrary and capricious action.

146. Second, because the Unlawful Voter Initiative relies on admittedly faulty data and the list of the targeted voters was generated by faulty database matching methods—which employ "supplemental magic" and require agents to complete unlawful voter determinations in just twelve minutes—the Initiative constitutes arbitrary and capricious action.

147. Third, the Unlawful Voter Initiative relies on contrived and false justifications. The Initiative purportedly aims to uncover instances of unlawful noncitizen voting and invests tremendous resources to that effect. The breadth of the Initiative—encompassing all fifty states and tens, if not hundreds, of thousands of individuals—fails to account for the plethora of evidence demonstrating that noncitizen voting in U.S. elections is exceedingly rare.

148. The Unlawful Voter Initiative constitutes arbitrary and capricious agency action because it requires Defendants' agents to violate federal and state laws in pursuing the Initiative, flagrantly disregards known faults in the data underlying it, employs unreliable data-matching methods, entirely failed to consider important aspects of the problem, and relies on contrived, pretextual, and/or false justifications that run counter to the available evidence.

149. The Initiative therefore violates the Administrative Procedure Act, 5 U.S.C § 706(2) in this manner as well, as it is not committed to agency discretion by law and is a final agency action

**CLAIM V– Administrative Procedure Act**

***Accardi* Violation, 5 U.S.C. § 706**

150. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

151. Under the Administrative Procedure Act, courts must hold unlawful and set aside" agency action that is "not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

152. Under *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), government agencies must follow their own internal rules, regulations, and procedures which have "the force

and effect of law." *Id.* at 265–66. This principle (the *Accardi* principle) is "well-established," and "extends beyond formal regulations" to documents such as a federal agency's handbooks, operational instructions, and orders, *Alcaraz v. INS*, 384 F.3d 1150, 1162 (9th Cir 2004) (collecting cases), and even "practices for which the agency disclaims binding effect." *Ixchop-Perez v. Barr,* 821 Fed. Appx. 690, 695 (9th Cir. 2020).

153. DHS maintains an internal Handbook for Safeguarding Sensitive PII[87] and a Privacy Policy Guidance Memorandum "memorializ[ing] the Fair Information Practice Principles (FIPPs)."[88]

154. USCIS's Policy Manual similarly memorializes the FIPPs.[89]

155. The DHS List contains not only the PII of the purported noncitizen voters, but also information that is considered *sensitive* PII (SPII), such as their Social Security numbers.

156. The DHS Handbook for Safeguarding Sensitive PII requires agency personnel to verify that they have proper legal authorization to collect the specific SPII of these voters before "collecting or maintaining" that information.[90] Additionally, the third FIPP requires Defendants to "specifically articulate" that authority.[91]

157. The DHS Handbook for Safeguarding Sensitive PII also requires DHS to "be certain" that any databases which are the source of SPII are "covered by an approved Privacy Threshold

---

[87] U.S. Dep't of Homeland Sec., Privacy Policy Directive 047-01-007, Handbook for Safeguarding Sensitive PII 7 (Dec. 4, 2017), https://www.dhs.gov/sites/default/files/2024-03/17_1204_priv_handbooksafeguardingsensitivepii_rev3_047-01-007.pdf [https://perma.cc/KE5K-SBG7].

[88] U.S. Dep't of Homeland Sec., Privacy Policy Memorandum 2008-01, The Fair Information Practice Principles: Framework for Privacy Policy of Homeland Security 1 (Dec. 29, 2008), https://www.dhs.gov/sites/default/files/2024-01/Fair%20Information%20Principles_12_2008.pdf [https://perma.cc/R7F8-PLBY].

[89] U.S. Citizenship & Immigr. Servs., Policy Manual Chapter 7 – Privacy and Confidentiality (Oct. 23, 2026), https://www.uscis.gov/policy-manual/volume-1-part-a-chapter-7 [https://perma.cc/L2X8-L7HK].

[90] U.S. Dep't of Homeland Sec., Privacy Policy Directive 047-01-007, Handbook for Safeguarding Sensitive PII 9 (Dec. 4, 2017), https://www.dhs.gov/sites/default/files/2024-03/17_1204_priv_handbooksafeguardingsensitivepii_rev3_047-01-007.pdf [https://perma.cc/KE5K-SBG7].

[91] U.S. Dep't of Homeland Sec., Privacy Policy Memorandum 2008-01, The Fair Information Practice Principles: Framework for Privacy Policy of Homeland Security 3 (Dec. 29, 2008), https://www.dhs.gov/sites/default/files/2024-01/Fair%20Information%20Principles_12_2008.pdf [https://perma.cc/R7F8-PLBY].

Analysis (PTA) or Privacy Impact Assessment (PIA)."[92]

158. The DHS List draws from multiple government databases, commercial databases, and "supplemental magic." Defendants have not disclosed the full set of databases the DHS List draws from. On information and belief, Defendants cannot confirm that each of the databases the DHS List draws from comply with DHS's internal privacy guidelines as set out by the DHS Handbook for Safeguarding Sensitive PII, including the requirements that (1) DHS articulate the legal authority for collecting and maintaining the SPII contained in these databases, and (2) DHS ensure these databases are covered by approved PTAs or PIAs.

159. Further, the sixth FIPP requires Defendants to "to the extent practicable, ensure that PII is accurate, relevant, timely, and complete."[93]

160. Defendants have acknowledged that their Unlawful Voter Initiative relies on data and matching processes known to be notoriously incomplete and riddled with errors. The Initiative therefore violates the sixth FIPP because, in employing this data and matching process, it fails to ensure the PII of voters is "accurate" and "complete." Further, Defendants' reliance on so-called "supplemental magic" to source the A-Numbers of alleged noncitizen voters is far outside the bounds of the requirements of the sixth FIPP because such a specious source cannot even be assessed for relevance, let alone accuracy or completeness.

161. Plaintiffs have suffered substantial prejudice as a result of Defendants' departure from these requirements.

162. Plaintiffs have naturalized-citizen members and derivative citizen members, who, due to the inaccuracies in the data underlying the Unlawful Voter Initiative, are likely to be wrongfully identified by the Initiative as unlawful, non-citizen voters. These mistakes, in turn, subject these members to potential deprivations of their constitutional right to vote. These mistakes also make

[92] U.S. Dep't of Homeland Sec., Privacy Policy Directive 047-01-007, Handbook for Safeguarding Sensitive PII 9 (Dec. 4, 2017), https://www.dhs.gov/sites/default/files/2024-03/17_1204_priv_handbooksafeguardingsensitivepii_rev3_047-01-007.pdf [https://perma.cc/KE5K-SBG7].

[93] U.S. Dep't of Homeland Sec., Privacy Policy Memorandum 2008-01, The Fair Information Practice Principles: Framework for Privacy Policy of Homeland Security 4 (Dec. 29, 2008), https://www.dhs.gov/sites/default/files/2024-01/Fair%20Information%20Principles_12_2008.pdf [https://perma.cc/R7F8-PLBY].

it more likely that Defendants will create TECS records about them, resulting in myriad additional consequences including limitations on their ability to travel.

163. Defendants' departure from their internal handbooks, guidance, and policy manuals governing their use of PII thus violates the *Accardi* principle.

164. The Initiative therefore violates the Administrative Procedure Act, 5 U.S.C § 706(2) in this manner as well, as it is not committed to agency discretion and is a final agency action; is not in accordance with law; is beyond statutory authority; and is without observance of procedure required by law.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs request that this Court:

A. Declare that Defendants' Unlawful Voter Initiative violates the Uniform Standards Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(A), the Privacy Act, 5 U.S.C. § 552a(e)(5), and the APA protections against contrary-to-law and arbitrary-and-capricious agency action.

B. Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from conducting further investigations pursuant to the Unlawful Voter Initiative.

C. Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from demanding from any state or local elections official that said official refuse to provide a ballot to, or refrain from counting a ballot cast by, any person on the basis of such person's appearance on the DHS List or any similar list of purported noncitizen voters.

D. Issue a vacatur of Defendants' Unlawful Voter Initiative under the APA.

E. Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge all TECS records and other records created and maintained pursuant to the Unlawful Voter Initiative.

F. Award attorney's fees and costs associated with this litigation; and

G. Grant such other relief as this Court deems just and proper.

Dated October 28, 2026

Respectfully submitted,

/s/ Angelica Salceda
SHILPI AGRWAL (SBN 270749)
sagarwal@aclunc.org
ANGELICA SALCEDA (SBN 296152)
asalceda@aclunc.org
WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

JULIA A. GOMEZ (SBN 316270)
jgomez@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
P.O. Box 811370
Los Angeles, CA 90081
(213) 977-5232

MING CHEUNG*
mcheung@aclu.org
THERESA J. LEE*
tlee@aclu.org
GARRETT MUSCATEL*
garrettmuscatel@aclu.org
JUAN M. RUIZ TORO*
jruiztoro@aclu.org
DAVIN M. ROSBOROUGH
drosborough@aclu.org
SOPHIA LIN LAKIN*
slakin@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

LUCAS A. RODRIGUEZ*
lrodriguez@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION

915 15th Street NW
Washington, DC 20005
(202) 457-0800

NIYATI SHAH*
nshah@advancingjustice-aajc.org
NOAH BARON (SBN 321960)
nbaron@advancingjustice-aajc.org
SHALAKA PHADNIS (SBN 335896)
sphadnis@advancingjustice-aajc.org
ASIAN AMERICANS ADVANCING JUSTICE-AAJC
1620 L Street NW, Suite 1050
Washington, DC 20036
(202) 296-2300

SEAN F. BIGLEY (SBN 300851)
Sfbigley@ajsocal.org
CATHERINE Y. HWANG (SBN 340136)
Chwang@ajsocal.org
BINWANT K. KAHLON (SBN 366721)
Bkahlon@ajsocal.org
ASIAN AMERICANS ADVANCING JUSTICE SOUTHERN CALIFORNIA
1145 Wilshire Blvd.
Los Angeles, CA 90017
(213) 241-0286

*application for admission *pro hac vice* forthcoming

*Counsel for Plaintiffs*